Booth, Chief Justice,
delivered the opinion of the court:
The right of the plaintiff to recover the judgment sought in the petition is dependent upon the one question, i. e., Was the service rendered actually service in the Army ?
Plaintiff enlisted in the Army May 25, 1899, and had attained the rank of sergeant prior to his honorable discharge on May 24,1902, having served out his term of enlistment. The day following his discharge, i. e., May 25, 1902, he was appointed by proper military authority to the position of clerk in the Quartermaster Department of the Philippines, headquarters, Sixth Separate Brigade.
During the course of his employment his designation was changed to storekeeper, checker, and finally back to clerk. An Executive order of the President issued March 1, 1904, brought within Civil Service classification a large number of civilian employees of the War Department of the Philippines, of which the plaintiff was one, and he was at once classified under the Civil Service rules in accord with said order.
Plaintiff’s service in the Philippines continued from May 25, 1902, until January 4, 1906, when he was transferred to the Quartermaster’s Depot at Omaha, Nebraska. He remained at Omaha until January 2, 1914, when he was transferred back to the Philippine Department, where he continued his service in the Quartermaster’s office until ap *610 pointed a field clerk, which appointment he accepted on January 17, 1917.
If the plaintiff is legally entitled to include his civilian service of fourteen years, three months and four days in computing his longevity pay, judgment for the amount claimed, except as barred by the statute of limitations, follows. Two pay statutes are involved. The first is Section 11 of the act of May 18, 1920 (41 Stat. 604), providing as follows:
* * * That hereafter longevity pay for officers in the Army, Navy, Marine Corps, Coast Guard, Public Health Service, and Coast and Geodetic Survey shall be based on the total of all service in any or all of said services.
The second is the act of June 10, 1922 (42 Stat. 625), which establishes the rate of pay for the commissioned and enlisted persomiel of the Army.
In argument much is said with respect to the case of United States v. Noce, 268 U. S. 613. The Supreme Court in this case was not concerned with civilian service such as we have here. This court had decided when the Noce case was before it (58 C. Cls. 688) that the proviso to Section 11 of the act of May 18, 1920 (supra), by implication repealed Section 6 of the act of August 24, 1912 (37 Stat. 569, 594), an act which prohibited the computing of service as a cadet at the Military Academy for the purpose of longevity pay. The Supreme Court reversed this court, and in so doing commented somewhat extensively upon the scope of Section 11 of the act of May 18, 1920 (supra).
In the Noce ease the court said (page 616) :
It is this proviso which it is said repealed the laws of 1912 and 1913 above quoted. It is urged that the words ‘longevity pay shall be based on the total of all service in any or all of said services’ are inconsistent with the exclusion of service in the Military Academy or in the Naval Academy from the calculation of longevity pay.
We are unable to put such a construction on this proviso. The whole Act was intended to promote equality between the six services. After equalizing their pay, it was intended to give any officer or any man in either of the services the benefit of longevity increases for any service *611 which, he might have had in any other of the services. The Report of the Managers of the House of Representatives as to § 11 and its proviso (H. R. 948, 66th Congress, 2nd Sess.) said:
“It provides that commissioned officers of the Coast and Geodetic Survey, a highly technical and specialized service, shall receive the same pay and allowances as are prescribed for officers of the Navy with whom they hold relative rank as prescribed in the Act of May 22, 1917. It also contains a proviso placing dll services on an equality in the matter of computation of longevity or service pay."
In other words, the longevity pay of a member of any service was to be determined by his total service in any or all of the services. It was not dealing with the rules as to the longevity in any one service. It was to make the calculation of longevity as if the six services were but one service. It was not aiming at any inequality within a service but at an inequality between services. No reference is made to cadet service and nothing to indicate that Congress had it in mind.
The findings disclose that the Executive order of the President issued March 1, 1904, classified under the Civil Service rules all positions in the Civil Service of the War Department in the Philippines, with certain exceptions immaterial to this case. The plaintiff was so classified and obtained the benefits of such a classification. In other words, his tenure of office, his eligibility for transfer to competitive positions in the United States, and the subject matter of his removal from office were all determinable under Civil Service and not Army laws or regulations.
The Supreme Court in the Noce case was not confronted with a state of facts comparable to the issue herein. In the Woods case, 62 C. Cls. 610, this court in awarding judgment for the plaintiff, did use some language indicative of giving a broadened scope to the act of May 18, 1920. It was not essential to the result reached to do so. The position to which Woods was appointed ranked him as a non-commissioned officer in the service and entitled him to receive quarters, subsistence, and laundry. It is true his appointment was made in compliance with Section 3 of Civil Service Rule 2, but his duties in the service were of the same professional character as members of the service to *612 which he was appointed, and his status thereafter was assimilated to theirs. The Public Health Service exacted of Woods a character of professional service difficult to segregate from the inherent character of service demanded of doctors performing the same.
Section 3 of Civil Service Buie 2 provided for making appointments to excepted positions named in Schedule A of the Civil Service rules without examination or upon noncompetitive examination, and it is construed to mean “all excepted positions are within the classified service, and no removal may be made therefrom for political reasons”, and it is pointed out in the annual report of the Civil Service Commission that “a person appointed to an excepted place must perform the legitimate duties of that and of no other place, unless the duties of the other place are performed in addition to and not in lieu of the duties of the excepted place.”
It is evident from the above quotations taken from the report of the Civil Service Commission that employees at the Naval Hospital perform services under such unusual conditions that it is “in the interest of economy and good administration that the present practice of appointment (without regard to regulations) be continued.” As we have set forth, the services of Woods were such that he was considered as a member of the service itself.
The Cartwright case, 74 C. Cls. 186, involved a clerk to the commandant of the Naval Station, Tutuila, Samoa. The record discloses the following facts with respect to Cartwright’s duties:
Under the aforesaid appointment plaintiff was designated as office manager and official aid to the commandant; he had charge under the commandant of assignments of the clerical force of enlisted men in the Navy and of all clerical work in the office of the commandant, including the governor and commandant’s writing, station, and ship’s writing, including logs, service records, muster rolls, and all reports and records required by the Navy regulations; he performed duties assimilated to those of a flag secretary, was in charge of enlisted men of the Navy assigned to duty in the commandant’s office, was assigned a battle station, went to sea with the commandant when required, and per *613 formed any and all naval duties assigned to him by the commandant.
This court in awarding plaintiff a judgment under Section 11 of the act of May 18, 1920, said—
Under section 1556 of the Revised Statutes, Title XY— The Navy, chap. 8, Pay, emoluments, and allowances, which provides for the pay of officers and enlisted men of the Navy, the pay for clerks to commandants of naval stations is specifically provided for along with other officers of the Navy. The plaintiff was appointed by the Secretary of the Navy. He was required to sign the oath and he was assigned to his position at the naval station under the commandant of the naval station, which was situated on an island under the control and discipline of the Navy with a naval officer in charge. He may have been required to perform clerical services, but they were clerical services in a naval establishment for military purposes. He was a part and parcel of the naval establishment on the island of Samoa. * * * yye carL find nothing in the act designating clerks to commandants of naval stations as civilian employees (Pp. 188, 189).
See United States v. Hendee, 124 U. S. 309.
The Pitt case, 17 C. Cls. 275, certiorari denied, 290 U. S. 640, forcibly presents the necessity of adjudicating this class of cases upon the facts involved in each. Originally the entire service to which Pitt was appointed was under Civil Service classification and he received his appointment therein under Civil Service law. Later the Life-Saving Service, by the act of January 28, 1915 (38 Stat. 800), was combined with the Revenue Cutter Service and known thereafter as the Coast Guard. Pitt continued in precisely the same status in the Coast Guard that he had previously attained in the Life-Saving Service, until January 1924, when he was appointed a warrant officer in the Coast Guard. His especial duties during the entire period from the date of his appointment in September 1905 until January 1924 were in this special service.
The opinion of this court pointed out in detail that plaintiff’s service was as follows:
It not only entailed the hazardous work of rescue during storms but nightly patrol of the shore in vigilant watchfulness during all sorts of weather. The period of greatest *614 vigilance was the time of bad weatber. Time was a great element in the equation of success or failure in its work. Each man had his place and particular duty to perform collectively and individually. Located at certain strategic outposts were telephone boxes from which quick communication could be had with the main station by the beach patrolman. The telephone service was a necessary and important part of each station without which delay would result which would carry in its wake loss of life and property. The maintenance of the telephone service was essential to the proper and efficient function of each station. These telephone lines were subjected to greatest stress during stormy weather and blizzards, and it was during these periods when the work of the telephone lineman was most imperative and necessary. The line of communication had to be maintained at all times. Minutes measure the space between safety and destruction. The services of a telephone lineman entailed risk of life and limb just as much as do the services of the sailors who ‘go down to- the deep’ in surf-boats during rescue work. The service was highly creditable (pp. 277, 278).
Obviously Pitt’s transfer from one form ’of service to another was, in substance, formal, and in a service which was of itself a combination of others of a similar character.
The plaintiff in this case had just completed his enlisted service in the Army. If he had intended strictly Army service he could have re-enlisted; instead, however,'he accepted the position of a clerk in the Quartermaster’s Department. This position subsequent to plaintiff’s appointment is included in the Executive order extending Civil Service classification to all positions named in the same. Therefore there can be no doubt that eligibility for the position was not dependent upon either previous or existing service in the Army, and by accepting the position he became a civilian employee under civil service classification, independent of regulations having to do with the services of an enlisted man or an officer in the Army.
The findings disclose sporadic instances involving the delivery of quartermaster supplies to outlying stations when the plaintiff was required to carry arms as a matter of protection to himself and property against the insurrectionists, but the fundamental scope of his duties was clerical in its *615 nature, and be could not have been commanded to “shoulder a musket” and take his place in the ranks of the enlisted men, subject to Army discipline and exposed to the same hazards.
For nearly eight years the plaintiff remained at Omaha, Nebraska, as a clerk in the quartermaster depot. Assuredly it may not be contended that during this period of time his services were of such a nature as the services of one in the enlisted personnel or on the active list of officers in the Army. To-day in both the War and Navy Departments in Washington and elsewhere innumerable Civil Service clerks and other employees are discharging duties connected with the administrative department of the same. Some reason must exist for removing this large class of Civil Service employees from strict military jurisdiction and fix for them a status under Civil Service. Can it be other than the nature and character of the duties they perform?
The Hendee case (supra) raised the single issue as to whether, under the act of March 3, 1883 (22 Stat. 472, 473), Hendee, a Navy paymaster’s clerk, was an officer in the Navy within the meaning of said act. This court in an opinion by its then Chief Justice decided (22 C. Cls. 134) that Hendee was entitled to include his services as a paymaster’s clerk in the Navy in computing his longevity pay. This court’s opinion, as well as the opinion of the Supreme Court affirming the same, accorded determinative weight to what was said by the court in the case of In re Bogart, a habeas corpus proceeding instituted in the United States Circuit Court of California.
In deciding the Bogart ease the court said (pp. 143-144) :
“Was the petitioner, while a clerk of a paymaster in the Navy, on duty in the manner before stated, a person in the naval forces of the United States within the meaning of this act ? It is contended on his behalf that he is not. But upon this point we entertain no doubt. He was not merely an employe or servant of the paymaster, but, on the contrary, as we have seen from the regulations of the Navy, set out in the statement of facts, he was an officer in the Navy. He received his position by appointment, which appointment was required to be approved by the commander of the ship. He was required to give a written acceptance, in *616 which he bound himself to be subject to the laws, regulations, and discipline of the Navy, which acceptance is required to be filed in the Department. He was required to qualify by taking an oath, and to expressly engage to serve till regularly discharged; and this could only be done by the appointing power, approved in the same manner as his appointment had been approved.
“He was an officer of the same class as the paymaster himself, the surgeon, engineer, &c., viz, a staff officer; and he ranked with midshipmen, who are line officers” (3 Sawyer C. C. R., 407).
Impossible as it is to ascertain or fix an invariable rule applicable to cases similar to the instant one, upon any other basis than the disclosure by the record of the character of the service performed, the manner of appointment, tenure of office, and the additional incidents connected therewith, we think that as to this case the record does not warrant a judgment in favor of the plaintiff, and that the facts bring the case within the case of Schreiner, Admx., v. United States, 43 C. Cls. 480, and the petition will be dismissed. It is so ordered.
Whaley, Judge; Williams, Judge; Littleton, Judge; and Green, Judge, concur.